**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**


| | | |
|---|---|---|
| **RENEGADE ACUPUNCTURIST** | ) | |
| **MEDIA, LLC,** | ) | |
| | ) | **Case No. _____** |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KIMBERLY THOMPSON,** | ) | |
| | ) | |
|     **Defendant.** | | |


**<u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## INTRODUCTION

Plaintiff Renegade Acupuncturist Media, LLC ("Renegade" or "Plaintiff") brings this action to protect and preserve its confidential and proprietary information and goodwill and to redress the unlawful use of Renegade's confidential and proprietary information by its former client Kimberly Thompson ("Defendant").

"Dr. Kimberly is always up to 'something.' . . . Like we said….Dr. Kimberly is always up to SOMETHING!" Compl. Ex. H (emphasis in original). Unfortunately, Renegade has found this assertion by Defendant on her business's Facebook page to be all too true. Defendant has started a program to teach concepts learned during her participation in Renegade's #SHIFT$^{TM}$ program ("#SHIFT") and Advanced Mentoring Program ("AMP"), and Defendant seeks to offer these through a competitive entity. These actions are in direct violation of unambiguous and enforceable non-disclosure and confidentiality provisions in the Seminar Participation Agreement (the "SP Agreement") signed before Defendant's participation in #SHIFT and the Advanced Mentoring Program Agreement (the "AMP Agreement") signed before Defendant's participation in AMP (collectively, the "Agreements").

During Defendant's participation in #SHIFT and AMP, Renegade provided to Defendant its most vital confidential and proprietary information and goodwill. Renegade required Defendant to sign the Agreements at the outset of her participation in each respective program to protect Renegade's valuable confidential and proprietary information and goodwill. Defendant agreed that Renegade would be entitled to injunctive and equitable relief in the event that the confidentiality and non-use obligations of the Agreement were breached.

Additionally, prior to Defendant's participation in #SHIFT, Defendant completed a Pre-Seminar Questionnaire where she was required to acknowledge that she would be required to sign

a non-disclosure that she would not teach, mentor or coach or otherwise disclose the proprietary material.

Despite these assurances made to Renegade prior to Defendant receiving Renegade's confidential and proprietary information, Defendant now intends to offer an instructional program teaching the same or highly similar concepts to Renegade's #SHIFT program and AMP, through which Defendant will inevitably disclose Renegade's highly confidential and proprietary information. As a matter of fact, Defendant will offer the program through AcuGraph.

Renegade seeks this Court's immediate assistance in stopping the irreparable harm that Renegade has and will suffer as the result of Defendant's blatant violation of the Agreements and disregard for business ethics. Given the clear violations of the Agreements, and the resulting harm, Renegade requests that this Court enjoin Defendant from continuing to violate the Agreements and misappropriating Renegade's confidential and proprietary business information and goodwill.

## FACTUAL BACKGROUND

### I.    Renegade's Business

Renegade is in the business of offering seminars and conferences to teach business management consulting, training, and advisory for the holistic health practices, including the acupuncture, chiropractic, alternative medicine, and massage industries. Verified Complaint ("Compl.") ¶ 10. Specifically, Renegade offers #SHIFT, a weekend-long intensive mentoring program, and AMP a nine (9) month mentoring program, each providing Renegade proprietary and confidential information to participants, including coaching and training tools, techniques, know-how, methods, processes, strategies, and industry expertise developed by Renegade to help strengthen attendees' holistic health practices (the "Renegade Proprietary Information"). *Id.* ¶¶ 11,

29. Renegade offers the opportunity for certain AMP clients to continue participation in AMP for an additional twelve-month term. *Id.* ¶ 30.

In AMP specifically, participants receive Renegade Proprietary Information related to mentorship and coaching regarding the operation of a successful holistic health practices business; thorough analysis of participants' practices; advice regarding marketing strategies; and other information, techniques, know-how, methods, processes, and industry expertise developed by Renegade aimed at assisting participants with strengthening their holistic health practice for long-term success as part of AMP. *Id.* ¶ 31.

The mentorship programming developed by Renegade allows Renegade to provide comprehensive mentorship to its clients throughout the United States and worldwide. *Id.* ¶¶ 12, 32. The mentorship programming offered by Renegade is specialized, and Renegade has spent substantial time, money, and effort in developing the Renegade Proprietary Information. *Id.* ¶¶ 12, 32. Renegade views the Renegade Proprietary Information as a key strategic advantage in the industry. *Id.* ¶¶ 47, 49.

## II.    Defendant's Participation in #SHIFT and AMP and Access to Renegade Proprietary Information

On information and belief Defendant offers holistic health services through the entity Meridian Family Acupuncture located in Meridian, Idaho. *See* Meridian Family Acupuncture, https://www.meridianfamilyacupuncture.com/ (last visited September 5, 2022); *see also* Compl. Exs. C, D, F. On information and belief, Defendant has also offered services in conjunction with AcuGraph since at least as early as August 2021. *See* Compl. ¶ 9.

In order to further develop her acupuncturist practice, Defendant participated in the weekend-long #SHIFT program in Myrtle Beach, South Carolina on August 28–29, 2021. Compl. ¶ 46. Following #SHIFT, Defendant was accepted into AMP and participated in the program from

August 29, 2021 to May 29, 2022. *Id.* ¶ 48. As a result of her participation in #SHIFT and AMP, Defendant was provided with an extensive and detailed education of the Renegade Proprietary Information developed by Renegade to assist Renegade's clients with the further development and success of their holistic health services practices. *Id.* ¶¶ 47, 49. Specifically, Renegade disclosed to Defendant mentorship and coaching techniques, know-how, methods, and processes developed to assist clients with operating a successful holistic health practices business, including practice analysis, marketing strategies, and industry expertise. *Id.* ¶¶ 11, 29, 31, 78. These proprietary tools, taken individually and in combination, represent one of Renegade's leading strategic advantages over its competitors and provide a critically important differentiator in the marketplace. *Id.* ¶¶ 47, 49.

### III.    <u>Defendant Voluntarily Entered the Agreement</u>

Defendant entered the SP Agreement at the beginning of #SHIFT and as consideration for Defendant's participation in #SHIFT and access to the Renegade Proprietary Information. *Id.* ¶¶ 15–16. Similarly, Defendant entered the AMP Agreement at the beginning of the AMP program as consideration for Defendant's participation in the AMP and access to the Renegade Proprietary Information. *Id.* ¶¶ 34–35.

The Agreements included necessary and reasonable restrictive covenants, including confidentiality and non-use obligations. By executing the Agreements, Defendant expressly agreed that she would only use information received pursuant to #SHIFT and AMP, respectively, "in confidence" and "[would] not disclose any [] Information to any third parties, but [would] limit its disclosure to bona fide employees of the Participant on a need to know basis," and only to a bona fide employee pursuant to confidentiality obligations equal to or great than those in each respective Agreement. *Id.* ¶¶ 17, 37.

Additionally, the Agreements required Defendant to disclose "any associations, affiliations of Participant, personal or professional, that could be viewed as competitive entities, and/or may present a conflict for Participant . . . ." *Id.* ¶ 23, 43. Compl. Exs. A ¶ 8, B ¶ 9. In the SP Agreement, Defendant listed AcuGraph as a "competitive entit[y] and/or [entity that] may present a conflict." Compl. ¶ 23; Compl. Ex. A ¶ 8. In the AMP Agreement, Defendant listed Miridia, the creator of AcuGraph, as a "competitive entit[y] and/or [entity that] may present a conflict." Compl. ¶ 43; Compl. Ex. B ¶ 9. Defendant provided assurances to Renegade that she would not disclose the Renegade Proprietary Information to Miridia/AcuGraph.

Defendant agreed that any breach or threatened breach of the Agreement would entitle Renegade to obtain temporary and permanent injunctive relief against any breach or threatened breach of the Agreement, in addition to all other rights and remedies available to Renegade under South Carolina law, which governs the Agreements. *Id.* ¶¶ 20, 25, 40, 45; *see also* Compl. Exs. A ¶ 12, B ¶ 13.

In addition to the Agreements, Defendant completed a Pre-Seminar Questionnaire prior to her participation in #SHIFT. Compl. ¶¶ 26–28. The Pre-Seminar Questionnaire provides Renegade with a better understanding of the #SHIFT participant, their clinic and background, allowing Renegade to make any adjustments to better tailor the curriculum to the #SHIFT attendees. *Id.* ¶ 27. As part of the #SHIFT questionnaire, Defendant was required to confirm that she "understand[s] [she] will be required to sign a non-disclosure that [she] ***may not teach / mentor / coach or otherwise disclose this proprietary material*** [she] learn[s] this weekend to others." *Id.* ¶ 28.

Despite Defendant's agreement and assertions to the contrary in both the Agreements and Pre-Seminar Questionnaire, Defendant now seeks to provide a program using the Renegade

Proprietary Information through AcuGraph, which Defendant explicitly identified as a competitor in the Agreements. Compl. ¶¶ 23, 43, 47–53; Compl. Exs. A ¶ 8, B ¶ 9, I.

IV.    **Termination of Agreements and Discovery of Defendant's Program**

Defendant permitted the Agreements to terminate on May 29, 2022, after deciding not to renew the AMP Agreement. Compl. ¶¶ 21, 41. Although the Agreements terminated, the confidentiality and non-use obligations of each Agreement survive the termination of the Agreement. *Id.* ¶¶ 22, 42. Therefore, the confidentiality and non-use obligations of the Agreement remain in full force and effect.

In July 2022, less than three months after Defendant decided not to renew the AMP Agreement, Renegade learned through its own diligence that Defendant had started developing a program in direct violation of the non-disclosure and confidentiality provisions of the Agreements. *Id.* ¶¶ 51, 56–57; *see also* Compl. Exs. F, I, J. In early July, Defendant posted on her acupuncture clinic's Facebook page, that

> she will be beginning a new teaching program so that she and her colleagues can share what they have learned with other doctors and practitioners . . . . We are rapidly growing her dream of becoming a 'teaching clinic' where she can offer hands-on mentorship. . . . She studies with the BEST, to become the BEST, so that she can offer the BEST care.

Compl. ¶ 51 (emphasis in original); Compl. Ex. E. This post included a photograph of Defendant and three other former Renegade clients. Compl. ¶ 51 (emphasis in original); Compl. Ex. E.

Due to the reference in the post of Defendant "shar[ing] what [she has] learned" based on studies with the "best," Renegade sent correspondence to Defendant on July 26, 2022, reminding her of her continuing confidentiality and nondisclosure obligations under the Agreements. Compl. ¶ 52; Compl. Ex. F. Renegade highlighted the confidentiality and non-use obligations in the Agreement expressly prohibiting Defendant from "shar[ing], teach[ing], or otherwise disclos[ing] any written

materials or techniques provided or taught during [#SHIFT] or [AMP]." Compl. ¶ 43; Compl. Ex. F. Renegade did not receive a response to this correspondence. *Id.* ¶ 54.

As a result of Defendant's non-responsiveness, Renegade continued monitoring Defendant's activity. On August 18, 2022, Defendant posted on her acupuncture clinic's Facebook page: "Dr. Kimberly is always up to 'something.' . . . Like we said….Dr. Kimberly is always up to SOMETHING!" Compl. ¶ 55; Compl. Ex. H. (emphasis in original). Then, on or about August 20, 2022, Renegade found that its worst fears had been confirmed—Defendant was "up to something." Renegade discovered that Defendant began offering a site for potential clients to sign-up to participate in an AcuGraph Accelerator Program with AcuGraph Acupuncture Technology. Compl. ¶ 56; Compl. Ex. I.

Nearly identical to the aims of Renegade's #SHIFT and AMP programs, the AcuGraph Accelerator Program intends to teach holistic health service providers how to "be a better acupuncturist," "build a bigger practice," "transform brand new patients into wellness patients," teach "the skillset to build a sustainable six-figure income," and "learn to think outside of the box." Compl. ¶ 56 (emphasis omitted); Compl. Ex. I. Specifically, in the description of the AcuGraph Acupuncture Technology program, Defendant explains:

> Last year, I went down a new path [and] started a ***mentorship program and learned from some of the best doctors in the nation***. While on this journey I met some amazing doctors . . . but, they weren't using AcuGraph. ***So I thought I'd try my hand at what they were doing and see how it went. I wanted to be like them, because I thought they were successful.*** Long story short, after being asked time and time again by my peers in the program to teach them about AcuGraph, I realized I had something these other doctors wanted and needed. So . . .
>
> - I went back to my clinic and reevaluated how I was assessing patients
> - I fine-tuned my AcuGraph skillset and took it to a whole new level
> - My practice tripled
> - I'm more successful than I have ever been

- AcuGraph is the center of my clinic.

Compl. ¶ 57; Compl. Ex. I. In conjunction with the AcuGraph Accelerator Program, Defendant will also offer a Three-Day Intensive at her clinic located in Meridian, Idaho, on November 4–6, 2022. Compl. ¶ 60; Compl. Ex. I.

The similarities between the AcuGraph Accelerator Program and Three-Day Intensive that Defendant plans to offer (the "Thompson Program") and Renegade's #SHIFT program and AMP are obvious. Like Renegade's proprietary programs, Defendant's program will also offer evaluation of the participants' practice, teach skills to build a bigger practice, and provide "the skillset to build a sustainable six-figure income." Compl. ¶¶ 56–57; Compl. Ex. I.

Given the similarities between Renegade's mentorship programming and the Thompson Program as described above, the Thompson Program will necessarily and inevitably disclose the proprietary and confidential information that Defendant learned during her participation in #SHIFT and AMP. It is therefore impossible for Defendant to offer the Thompson Program without using the Renegade Proprietary Information and goodwill she obtained during #SHIFT program and AMP, and use of the Renegade Proprietary Information will unfairly benefit Defendant.

After reviewing the Thompson Program and recognizing the threatened disclosure of the Renegade Proprietary Information, Renegade's counsel sent follow-up correspondence to Thompson on September 1, 2022. Compl. ¶ 63; Compl. Ex. J. Renegade requested a response by 5 P.M. EST on September 6, 2022 due to the September 12, 2022 start date for the Thompson Program. Compl. ¶ 63; Compl. Exs. J, K. Renegade received a response from Defendant on Tuesday, September 6, 2022 at 4:59:51 P.M. EST stating that she received the communications and "will provide an appropriate response in due time." Compl. ¶ 64; Compl. Ex. K. The correspondence did not address any issues or provide any assurances to Renegade. *See* Compl. ¶ 65; Compl. Ex. K.   The

correspondence also did not discuss the provision of the Thompson Program through a competitor. Compl. Ex. K.

On September 7, 2022, Renegade received correspondence from Defendant's counsel stating that Defendant "has not breached any agreement." Compl. ¶ 65; Compl. Ex. L. The correspondence failed, however, to provide any evidence or reasonable assurances that the Thompson Program does not include the Renegade Proprietary Information. Compl. ¶ 65; Compl. Ex. L. The correspondence also ignores that Defendant will offer the Thompson Program through AcuGraph, which has been described by Defendant as a competitive entity and/or may present a conflict for Defendant. *See* Compl. ¶¶ 24, 44, 80; Compl. Exs. A ¶ 8, B ¶ 9, L.

Renegade provided Defendant a lengthy period from July 26, 2022 to September 9, 2022 to fully respond to the issues raised in its letters and provide assurances and reasonable evidence that Defendant does not intend to breach the Agreements or misappropriate the Renegade Proprietary Information. However, Defendant was unable to provide such assurances or even discuss the issues raised by Renegade, and in fact refused to do so. Defendant's inability to provide reasonable information to reassure Renegade that she is not including the Renegade Proprietary Information in the Thompson Program in breach of the Agreements and the representations in the Pre-Seminar Questionnaire leads to the adverse inference that the Thompson Program ***must*** utilize the Renegade Proprietary Information. With the start date of the Thompson Program only a few days away, Renegade has no choice but to file the present action.

## **ARGUMENT**

This Court should immediately grant Renegade's motion for a temporary restraining order ("TRO") to prevent further irreparable harm pending a preliminary injunction hearing. Further, after issuing the TRO and conducting a hearing, this Court should issue a preliminary injunction

to protect Renegade's interests and prevent further and future harm pursuant to the disclosure of the Renegade Proprietary Information.

Federal Rule of Civil Procedure Rule 65 permits federal courts to issue TROs and preliminary injunctions. *See* Fed. R. Civ. P. 65. "A party seeking a [TRO and] preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest." *See Belimed, Inc. v. Bleecker*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *2 (D.S.C. Mar. 29, 2022) (citing *Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013)); *see, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these four factors weigh in favor of granting both a TRO and preliminary injunction.

## I.    Renegade is Likely to Succeed on the Merits of its Claims.

First, the party seeking a preliminary injunction "must make a 'clear showing' that it is likely to succeed on the merits." *Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *6 (citing *JAK Prods., Inc. v. Bayer*, 616 F. App'x 94, 95 (4th Cir. 2015)). Renegade can establish a likelihood of success on the merits as to each of its claims against Defendant.

The Court's "finding a likelihood of success on the merits is not 'tantamount to [a] decision[] on the underlying merits,' and courts should not 'improperly equate[] "likelihood of success" with "success."'" *Prysmian Cables & Sys. USA, LLC Prysmian v. Szymanski*, 2021 U.S. Dist. LEXIS 229102, at *21 (D.S.C. Nov. 29, 2021) (alterations in original) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981)). Such "clear showing" does not require a "certainty of success," but rather, a "clear showing" of a likelihood of success at trial. *Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *6 (citing *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th

Cir. 2017)). Therefore, Renegade must only make a showing that it will likely succeed on its claims at trial.

**A.**    **Renegade is Likely to Succeed on its Breach of Contract Claim.**

The Agreements executed by Defendant prior to her participation in both #SHIFT and AMP include confidentiality and non-use obligations. *See* Compl. ¶¶ 15, 35; *see also* Compl. Exs. A, B. Both Agreements state that Renegade's confidential and proprietary information, which includes, "information relating to written materials and techniques," must be held in confidence and shall not be disclosed to any third-parties except a participant's employees, who must also be bound by confidentiality and non-use obligations. *See* Compl. ¶¶ 18, 38; *see also* Compl. Exs. A, B.

"To show a likelihood of success on the merits, Plaintiff[] must establish the existence of a valid and enforceable contract, breach of the contract, and damages caused by that breach." *Vessel Med., Inc. v. Elliott*, No. 6:15-CV-00330-MGL, 2015 WL 5437173, at *7 (D.S.C. Sept. 15, 2015); *see also Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *6, *9. Renegade satisfies each of these requirements.

**1.**    The Agreements are Enforceable.

South Carolina courts have suggested that non-disclosure agreements should be analyzed on the basis of whether the confidentiality and non-use obligations are: (1) necessary for the protection of the discloser's legitimate interests; (2) are reasonably limited with respect to time and place; (3) not unduly harsh and oppressive in curtailing the legitimate efforts of the non-disclosing party to earn a livelihood; (4) reasonable from the standpoint of sound public policy; and (5) supported by valuable consideration. *See Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *6 (citing *Milliken & Co. v. Morin (Milliken I)*, 685 S.E.2d 828, 834 (S.C. Ct. App.

2009); and then citing *Carolina Chem. Equip. Co., Inc. v. Muckenfuss*, 471 S.E.2d 721, 723 (S.C. Ct. App. 1996)).

First, "businesses have a legitimate interest in protecting confidential information." *Id.* (citing *Milliken & Co. v. Morin (Milliken II)*, 399 S.C. 23, 37, 731 S.E.2d 288, 295 (2012)). Renegade has satisfied this prong.

Second, the lack of temporal and geographic scope of the confidentiality provisions in the Agreements does not render the Agreements unenforceable. With regard to temporal scope, the non-disclosure provision survives the termination of the Agreements. Compl. ¶¶ 22, 42; Compl. Exs. A ¶ 12, B ¶ 13. However, this does not deem the confidentiality provision unreasonable in temporal scope. *See Milliken II*, 399 S.C. at 34 n.5. "Agreements not to divulge confidential information, unlike noncompetition agreements, may be valid and enforceable under certain circumstances even though they are unlimited as to time and place." *Id.* (quoting *Carolina Chemical Equip. Co.,* 322 S.C. at 301, 471 S.E.2d at 727 (Cureton, J., dissenting)). Further, non-disclosure provisions are not required to include geographic limitations, as this would defeat the purpose of non-disclosure requirements. *See Milliken II*, 399 S.C. at 34 n.5 ("Geographic scope has no relevance for invention assignment or confidentiality provisions."). Renegade has also satisfied this prong.

Third, the non-disclosure obligation in the Agreements is appropriately tailored. Courts have found non-disclosure and confidentiality obligations unenforceable to deny a TRO and/or preliminary injunction when the definition of confidential information is "so broad[] that virtually all of the information" received is encompassed by the definition. *Nucor Corp. v. Bell (Nucor I)*, 482 F. Supp. 2d 714, 729 (D.S.C. 2007); *Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *9. Here, the definition of "Seminar Information"/"Program Information" pursuant to

the Agreements is: "all terms of this Agreement and any proprietary Renegade information provided or developed by Renegade, including, without limitation, all information relating to written materials and techniques." Compl. ¶¶ 17, 37; Compl. Exs. A ¶ 12, B ¶ 13. This is not a wholesale prohibition on using information provided to or learned from Renegade during #SHIFT or AMP. Further, the non-disclosure obligations in the Agreements permits Defendant to share the Renegade Proprietary Information with her employees, but prohibits the sharing of the Renegade Proprietary Information with third-parties. Compl. ¶¶ 17, 37; Compl. Exs. A ¶ 12, B ¶ 13. The confidentiality provisions of the Agreements therefore only cover information that, if used or disclosed in spite of the confidentiality and non-use obligations, could affect the conduct of Renegade's business, its goodwill, or its competitive advantage, all of which are legitimate business interests and rightly protected by non-disclosure and confidentiality obligations under the law. Renegade has also satisfied the third prong of the analysis.

Fourth, there are no additional public policy considerations beyond those already discussed.

Finally, Defendant's participation in #SHIFT and AMP was consideration for Defendant's execution of the respective Agreements. As a result, the confidentiality and non-use obligations were supported by valuable consideration, and Renegade also satisfies the fifth prong.

2.    Defendant Breached the Confidentiality and Non-Use Obligations in the Agreements.

Although the Agreements are enforceable, and despite her agreement to be bound to the confidentiality and non-use obligations in the Agreements, Defendant has flagrantly disregarded her obligations under the Agreements in beginning to use and offer the Thompson Program through AcuGraph, a competitor.

As described above, Defendant waited less than three months after deciding not to renew the AMP Agreement to develop a program that would compete with Renegade's program in direct violation of the non-disclosure and confidentiality provisions of the Agreements and be offered by a Renegade competitor. Compl. ¶¶ 51, 56–57; Compl. Ex. E, I. Defendant's own Facebook post, including a photograph with three other, former Renegade clients, noted that Defendant planned to "share what [she has] learned" after "study[ing] with the best." Compl. ¶ 51; Compl. Ex. E. The Thompson Program surely identifies how Defendant will "share" the Renegade Proprietary Information in spite of her confidentiality and non-use obligations. Like Renegade's #SHIFT and AMP programs, the Thompson Program will teach holistic health service providers how to "be a better acupuncturist," "build a bigger practice," "transform brand new patients into wellness patients," teach "the skillset to build a sustainable six-figure income," and "learn to think outside of the box." Compl. ¶ 56 (emphasis omitted); Compl. Ex. E.

As a matter of fact, Defendant's own description of the Thompson Program notes that she "went down a new path [and] started a mentorship program and learned from the best doctors in the nation" where "peers in the program asked questions about AcuGraph," which caused Defendant to go "back to [her] clinic and reevaluate[] how [she] was assessing patients" and "fine-tuned [her] AcuGraph skillset and took it to a whole new level." Compl. ¶ 57; Compl. Ex. I. Defendant clearly admits that she has "fine-tuned" her practice in accordance with the skills she

learned from Renegade during the #SHIFT program and AMP and now intends to share that refined skillset with other holistic health practitioners. Compl. ¶ 57; Compl. Ex. I.

Even if Defendant's discussion of the Thompson Program cannot be considered a clear admission that it will include the Renegade Proprietary Information, Defendant will necessarily and inevitably disclose the Renegade Proprietary Information in breach of the confidentiality and non-use obligations in the Agreements. South Carolina courts have addressed the inevitable disclosure doctrine, which contemplates that a party that received confidential and proprietary information cannot reasonably or realistically avoid disclosing that information. *Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *11. South Carolina courts have discussed the inevitable disclosure doctrine, stating: "[T]here is little guidance from South Carolina courts [on the inevitable disclosure doctrine]. Nonetheless, the court believes that the South Carolina Supreme Court would recognize the inevitable disclosure doctrine." *Nucor Corp. v. Bell (Nucor II)*, No. 2:06-CV-02972-DCN, 2008 WL 9894350, at *16 (D.S.C. Mar. 14, 2008); *see also Belimed, Inc.*, No. 2:22-CV-00891-DCN, 2022 WL 939819, at *12. Defendant will be unable to offer the Thompson Program without using and disclosing the Renegade Proprietary Information and goodwill she obtained from Renegade during #SHIFT and AMP in breach of her confidentiality and non-use obligations pursuant to the Agreements. Such conduct amounts to clear breaches of the Agreements and supports granting Renegade's TRO and request for injunctive relief.

### B.    Renegade is Likely to Succeed on Its Unfair Trade Practices Claim.

Under the South Carolina Unfair Trade Practices Act ("SCUTPA"), a trade practice is "unfair" when it is offensive to the public policy or when it is immoral, unethical, or oppressive. S.C. Code Ann. § 39–5–10 *et seq.*; *see also Williams-Garrett v. Murphy*, 106 F. Supp. 2d 834, 844 (D.S.C. 2000). Oftentimes a violation of the SCUTPA involves misrepresentations to consumers.

*Williams-Garrett*, 106 F. Supp. 2d at 844; *see also Wingard v. Exxon Co., U.S.A.*, 819 F.Supp. 497, 506 (D.S.C. 1992). Here, Defendant is advertising and marketing the Thompson Program to clients who would otherwise participate in Renegade's conferences and seminars. Defendant's purpose in undertaking such damaging and costly actions is to afford herself an unfair competitive advantage over Renegade. Compl. ¶ 82. Such unfair competition permits Defendant to benefit at the expense of Renegade from the improper misappropriation, use and inevitable use of the Renegade Proprietary Information, interfering with Renegade's business relationship expectancies, and gaining the unfair advantage in obtaining a head start in her operations from not having to experience the same trial and errors that Renegade experienced in its development of #SHIFT and AMP. *Id.* The Thompson Program also involves misrepresentations to consumers, as the Thompson Program does not inform consumers that the information they will receive in the Thompson Program is the Renegade Proprietary Information. As a result of the unfair trade practices taken by Defendant and outlined herein, Renegade is likely to succeed on its unfair trade practices claim.

### C.    Renegade is Likely to Succeed on Its Misappropriation Claim.

"[T]o state a misappropriation claim, the plaintiff must demonstrate (1) the defendant copied or appropriated an item of the plaintiff's and (2) that item is not protected by a traditional theory of exclusive rights, such as patent, copyright, or trademark law." *Ethox Chem., LLC v. Coca-Cola Co.*, No. 6:12-CV-01682-TMC, 2012 WL 6761527, at *7 (D.S.C. Nov. 20, 2012), *report and recommendation adopted in part, rejected in part*, No. 6:12-CV-01682-TMC, 2013 WL 41001 (D.S.C. Jan. 3, 2013) (finding that Plaintiffs sufficiently pled a claim of misappropriation relying on *Super Duper Inc. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 385 S.C. 201, 683 S.E.2d 792 (S.C. 2009)). As noted, Defendant has copied and claimed as her own the Renegade

Proprietary Information. The Agreements do not permit Defendant's use of the Renegade Proprietary Information, and Renegade has not given Defendant permission to use the Renegade Proprietary Information. *See* Compl. ¶¶ 37, 17; *see also* Compl. Exs. A, B. Additionally, the Renegade Proprietary Information is not protected through a traditional theory of exclusive rights, such as patent or trademark law. Compl. ¶¶ 13, 33, 93. Therefore, Renegade is also likely to succeed on its misappropriation claim.

   **D.**  **Renegade is Likely to Succeed on Its Unjust Enrichment Claim.**

   To prevail on an unjust enrichment claim, a plaintiff must show the following elements: "(1) [a] benefit conferred by [the] plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P.*, 385 S.C. 452, 467, 684 S.E.2d 756, 764 (2009) (alterations in original) (quoting *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 341 S.C. 1, 8–9, 532 S.E.2d 868, 872 (2000)); *see also Hill Holiday Connors Cosmopulos, Inc. v. Greenfield*, No. 6:08-CV-03980-GRA, 2010 WL 11530748, at *6 (D.S.C. Apr. 8, 2010). Here, Renegade provided Defendant its confidential and proprietary information in exchange for Defendant's agreement that she would not use or misappropriate the Renegade Proprietary Information. Compl. ¶¶ 15, 35. However, Defendant has not complied with her confidentiality and non-use obligations pursuant to the Agreements and is using and misappropriating the Renegade Proprietary Information in the Thompson Program. As a result, there has been a legally cognizable benefit conferred upon Defendant, and the retention of the Renegade Proprietary Information by Defendant is inequitable.

**II.**  **<u>Renegade Has Established Irreparable Harm Absent Entry of Injunctive Relief.</u>**

   Renegade will suffer irreparable harm without the preliminary relief requested herein. First,

Defendant agreed and acknowledged in the Agreements that "Renegade's remedies at law for any breach of this provision would be inadequate and agrees that in the event of the [Defendant's] breach of any provision of this paragraph, Renegade *shall be entitled to appropriate equitable relief, including, but not limited to injunctive relief*, which remedy shall be non-exclusive without the need to post any bond." Compl. ¶¶ 17, 37 (emphasis added); Compl. Exs. A, B. As such, Defendant explicitly agreed to the granting of injunctive relief in the event of a breach of the confidentiality and non-use obligations in the Agreements.

Furthermore, Defendant's conduct presents an immediate threat of irreparable harm, which will continue in the absence of immediate injunctive relief. The use of the Renegade Proprietary Information in the Thompson Program is an immediate threat of irreparable harm, as Defendant seeks to capitalize upon the substantial time, money, and effort expended by Renegade in developing the Renegade Proprietary Information disclosed to participants in #SHIFT and AMP. Not only will the Thompson Program inevitably and necessarily include the Renegade Proprietary Information, the Thompson Program is being offered in connection with a Renegade competitor, AcuGraph, as defined by Defendant herself. Compl. ¶¶ 24, 44; Compl. Exs. A ¶ 8, B ¶ 9.

If Defendant is allowed to continue with her plan to offer the Thompson Program through a competitor (defined as such by Defendant), which clearly includes the Renegade Proprietary Information, such conduct would be detrimental to Renegade's competitive advantage and customer goodwill in which it has invested substantial time and resources. This violation of Defendant's confidentiality and non-use obligations would certainly inhibit Renegade's continuing economic viability and no amount of money could substitute for this harm. *See TitleMax of S.C., Inc. v. Crowley*, No. 4:20-CV-02938-JD-TER, 2021 WL 1669794, at *2 (D.S.C. Apr. 28, 2021) (determining that the plaintiff was likely to suffer irreparable harm because of evidence that creates

the possibility of permanent loss of goodwill and money damages are inadequate). Therefore, Renegade has suffered irreparable harm and will continue to suffer irreparable harm absent the TRO and preliminary injunction.

## III.    The Balance of Equities Strongly Favors Renegade.

Defendant executed the Agreements containing the non-use and confidentiality obligations. Furthermore, Defendant has been directly reminded of those confidentiality and non-use obligations on two separate occasions by Renegade. *See* Compl. ¶¶ 52, 63; Compl. Ex. F, G, J. Even after receiving an initial reminder on July 26, 2022, of the confidentiality and non-use obligations contained in the Agreements, Defendant continued forward with the Thompson Program. *Id.* ¶ 55. Defendant did so with the understanding that moving forward with the Thompson Program could render Defendant in breach of the Agreements. Nevertheless, Defendant could not even provide reasonable assurances or evidence to the contrary in response to the correspondence sent by Renegade's counsel on September 1, 2022. *Id.* ¶ 64; Compl. Exs. L, M. Because the Agreements were presented to Defendant as a condition of her participation in #SHIFT and AMP and were considered and voluntarily signed, Defendant's total disregard of her obligations also weigh in favor of injunctive relief. As such, the requested injunction serves only to enforce what was already agreed between the parties, and therefore, the injunctive relief sought by Renegade is appropriate.

## IV.    The Public Interest Favors Injunctive Relief.

South Carolina has determined that the appropriate way to encourage useful developments in science and technology is to give protection to confidential and proprietary information, and it is in the public interest to enforce these laws. *See Pearl Ins. Grp., LLC v. Baker*, No. 0:18-CV-02353-JMC, 2018 WL 4103333, at *5 (D.S.C. Aug. 29, 2018) ("The court also finds that the public interest

factor supports the issuance of a TRO in this case. The relief requested by Plaintiff is consistent with the public interests of enforcing valid contracts, preventing unfair competition, and protecting confidential, trade-secret information from improper misappropriation. There is not an adverse impact upon the public interest that may be caused by the issuance of the requested injunctive relief." (internal citations omitted)). The public interest is also in favor of preventing unfair competition in the marketplace, which would necessarily occur if Defendant was permitted to misappropriate the valuable Renegade Proprietary Information. *See id.* Finally, it is in the public interest to enjoin Defendant from engaging in illegal misconduct, and to require her to comply with her contractual duty. *T&S Brass & Bronze Works, Inc. v. Slanina*, No. CV 6:16-3687-MGL, 2017 WL 11310265, at *4 (D.S.C. Feb. 2, 2017) (finding that the public has an interest in prohibiting a defendant from using a plaintiff's "intellectual property, confidential information, and trade secrets in violation of contractual and legal obligations"). Accordingly, the public interest factor also weighs in favor of granting injunctive relief.

## CONCLUSION

It is clear that Defendant is "up to something"—misappropriation of Renegade's valuable proprietary and confidential information. For the foregoing reasons, Renegade respectfully requests that the Motion be granted, and that the Court entered a TRO and preliminary injunction in the manner set forth in the Motion.

Dated: September 11, 2022

BURR & FORMAN LLP

/s/ William Y. Klett, III
William Y. Klett, III, Esq.
Fed. Id. No. 5610
100 Calhoun Street, Suite 400
Charleston, South Carolina 29402
Ph: (843) 973-6805
Fax: (803) 933-1470
Email: wklett@burr.com

*Attorneys for Plaintiff Renegade*
*Acupuncturist Media, LLC*